**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVE COOK | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 22-3859 |
| BANK OF AMERICA, N.A. | : | |

**MEMORANDUM**

**SURRICK, J.**                                              **NOVEMBER 14, 2023**

This is an action under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (the

"FCRA"), specifically, the FCRA provisions applicable to the use of a "consumer report" for

employment purposes.  Presently before the Court is Defendant Bank of America, N.A.'s

("BANA") Motion to Dismiss Plaintiff's Complaint.  (ECF No. 5.)  For the following reasons,

BANA'S Motion will be denied.

**I.      BACKGROUND**[1]

Plaintiff Steve Cook ("Cook" or "Plaintiff") alleges that in a letter dated September 7,

2021, BANA offered him the position of Senior Vice President, Business Banking Sr.

Relationship Manager.  (Compl. ¶ 8, ECF No. 1.)  Cook's anticipated start date in this position

was September 27, 2021, conditioned on a satisfactory background investigation.  (*Id.* ¶ 9.)  On

or about September 8, 2021, Cook completed a BANA application form, signed a FCRA

Disclosure and Authorization, and signed the State and Local Information and Rights Regarding

Background Checks.  (*Id.* ¶ 10.)  In the ensuing weeks, Cook participated in the background

---

[1] The background is derived from Plaintiff's Complaint, the factual allegations of which
are accepted as true and construed in the light most favorable to Plaintiff as the non-moving
party. *See, e.g.*, *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022); *McTernan v. City of
York*, 577 F.3d 521, 526 (3d Cir. 2009).

investigation, and he or his counsel exchanged several communications with BANA personnel. (*See, e.g., id.* ¶¶ 11, 13-14, 18.)

Cook received a Screening Report dated September 9, 2021, from Business Information Group ("BIG"), a "consumer reporting agency," reflecting that he had received a passing score. (*Id.* ¶ 12.)  BANA did not provide this Screening Report to Cook, who obtained it on his own. (*Id.*)  On September 29, 2021, Cook received a call from Joshua Eckman[2] regarding his background check and was told that he had passed.  (*Id.* ¶ 13.)  Cook also authorized the release of his Employment Data Report from Equifax, which verified and confirmed the dates of his previous employment.  (*Id.* ¶ 15.)  On October 13, 2021, Cook received an email from BANA with his FBI screening results, which reflected that he had no prior arrest activity.  (*Id.* ¶ 19.) Plaintiff alleges that "[t]o his knowledge, no information was supplied during the background investigation that could even remotely be construed as negative."  (*Id.* ¶ 16.)

Nevertheless, "[w]hile awaiting the final results of the background investigation, [Plaintiff] learned that his start date with [BANA] had been pushed back a number of times." (*Id.* ¶ 17.)  On September 29, 2021, Cook received an email from BANA representative Leah Planck advising him that his background check had not been received yet, and his start date had been moved to October 4, 2021.  (*Id.* ¶ 14.)  It appears undisputed that BANA, in fact, rescinded Cook's employment offer, although it is unclear at this juncture precisely when BANA made that decision or when Cook or his counsel first learned or had reason to believe that the offer was being rescinded.  On October 5, 2021, Plaintiff's counsel sent a letter to BANA "for the purpose of determining why his employment offer was rescinded."  (*Id.* ¶ 21.)  On October 6, 2021,

---

[2] The Complaint does not allege Joshua Eckman's role or whether he was affiliated with BIG or BANA.

"Cook received an email from [BANA] Talent Acquisition that **he was no longer considered for the position *based on his 'background check results*.**'"  (*Id.* ¶ 18 (emphasis added.) Plaintiff alleges that "at no prior time was [he] made aware of any negative or adverse information that would be considered a 'red flag' with respect to his background." (*Id.* ¶ 20.)

On November 18, 2021, Plaintiff's counsel spoke by telephone with BANA's counsel to discuss why Cook's employment offer had been rescinded.  (*Id.* ¶ 22.)  On that call, BANA's counsel suggested for the first time that an investigation into a Paycheck Protection Program ("PPP") loan[3] received by Cook's business "may" have been the reason for BANA's withdrawal of his employment offer.  (*Id.*)   In subsequent communications, BANA "provided varying and inconsistent explanations" for its rescission of Plaintiff's job offer, including suggesting that "[Plaintiff] did not disclose a PPP loan; *a background investigation* revealed that [Plaintiff] 'may' have violated the terms of the SBA promissory note for a PPP loan; [Plaintiff's] receipt of a PPP loan was 'fraudulent'; and [Plaintiff's] use of PPP funds was inappropriate." (*Id.* ¶ 23 (emphasis added).)  Plaintiff alleges that "[b]ased on these varying and inconsistent explanations, it was evident that [BANA] was operating from misinformation, lack of information, and/or mistaken assumptions." (*Id.* ¶ 24.)  In communications with BANA, Plaintiff and his counsel disputed any suggestion of impropriety in relation to a PPP loan for his business.  (*Id.* ¶¶ 25-28.) In a January 21, 2022, email to Plaintiff's counsel, BANA's counsel stated "that Mr. Cook had both a PPP and EIDL loan or loans.  Only the EIDL loans were reviewed **as part of the**

---

[3] The PPP loan program was established pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), enacted in response to the COVID-19 pandemic. *See Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 408 (2d Cir. 2022); *see also* Pub L. No. 116-136, 134 Stat. 281 (2020).  "The PPP authorized the Small Business Administration (the "SBA") to guarantee favorable and potentially forgivable loans to businesses negatively impacted by the pandemic."  *Id.*; *see also* 15 U.S.C. § 636(a)(36) (codifying PPP program).

**background check process**." [4]  (*Id.* ¶ 28 (emphasis added).)  Plaintiff alleges that "[t]his was the first time since [he] was offered the position on September 7, 2021 that [BANA] suggested that Mr. Cook's receipt of EIDL loans was the reason the offer was withdrawn.  At no time during the hiring process did anyone on behalf of [BANA] ever mention EIDL loans to Mr. Cook." (*Id.* ¶ 30.)

The Complaint alleges that on February 15, 2022, BANA's counsel sent another email to Plaintiff's counsel regarding EIDL loans and grants to Cook's business.  This email stated:

> Jeff – Again, I apologize for the delay in more fully responding to your e-mails regarding Mr. Cook.  However, based on one of your last e-mails that suggested Mr. Cook had never heard of, or been asked about, "EIDL" funds as part of the Bank's background check, we felt it prudent to verify exactly what SBA COVID relief funds were deposited into Mr. Cook's VetteWork LLC business account.
>
> The account records show that Mr. Cook/VetteWork received both an Economic Injury Disaster Loan (EIDL) and an Economic Injury Disaster Grant (EIDG). The Bank's records also show that the background investigation team specifically identified EIDL/G proceeds when it spoke with Mr. Cook.
>
> (*Note: the VetteWork account also shows a separate deposit for the PPP funds associated with the Promissory Note you previously sent.  However, PPP is not part of the background check process, so played no role here.*)
>
> It is our understanding that, under the EIDL regulations, a borrower can use COVID EIDL proceeds for owner compensation as reasonable remuneration directly related to performance of services for the business to the extent necessary to carry the concern *until resumption of normal operations and not to exceed what the business could have provided in the absence of COVID*.  Based on VetteWork LLC account records, it appears that the business earned *more* in 2020, compared to its 2019/pre-COVID earnings and that Mr. Cook paid himself more in 2020 than 2019/pre-COVID levels. (*i.e.*, account records do *not* suggest that VetteWork, LLC experienced a downturn in 'normal business operations' that would have supported the receipt and use of EIDL and EIDG funds.)

---

[4] The CARES Act also temporarily expanded eligibility for SBA's Economic Injury Disaster Loan ("EIDL") program and appropriated funds for a new "Emergency EIDL Grants" program, also known as the EIDL Advance Program.  *See* Pub. L. No. 116-136, 134 Stat. 281 (2020).

Thank you for your patience and I hope this additional information will bring the matter to a close.  If you feel this analysis is in error or factually incorrect, please send me your position on these points, as they are the issues applicable to the background check assessment.

(BANA Mem. Ex. 1, ECF No. 6-1 (italics in original); *see also* Compl. ¶ 32 (excerpt of Feb. 15, 2022, email).)  Based on BANA's Memorandum in support of its Motion and the February 15, 2022, email attached as an exhibit thereto, the account records BANA reviewed were for Cook's business, VetteWorks, LLC, not for his individual accounts, if any, with BANA.  BANA's Motion and Memorandum do not state how it learned of VetteWorks, LLC's SBA program loans, or why and under what authority BANA reviewed the VetteWorks, LLC account records in connection with Plaintiff's prospective employment.  Plaintiff alleges that commercial banks, like BANA, are not parties to and have no role in the SBA EIDL program, and they do not underwrite, approve, fund, secure, administer, or service these loans.  (Compl. ¶ 31.)  Therefore, the Complaint alleges, "[BANA] relied on information from third parties, including but not limited to the SBA and other entities, to falsely conclude that [Plaintiff's] receipt of EIDL loans was improper.  (*Id.* ¶ 26.)

Based on the foregoing allegations, Plaintiff asserts a claim against BANA for violating the FCRA, specifically, 15 U.S.C. § 1681b(b)(3), by failing to provide Plaintiff the following before taking adverse employment action based in whole or in part on information obtained from a consumer report:  (a) the required pre-adverse action notice, (b) a copy of the consumer report, and (c) a written description of the consumer's rights under the FCRA.  (*Id.* ¶¶ 44-49.)  Plaintiff further alleges that BANA acted in an arbitrary and capricious manner in its violation of the FCRA.  (*Id.* ¶ 50.)

## II.    LEGAL STANDARD

"[A] plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face'" in order to survive a motion to dismiss pursuant to Rule 12(b)(6).  *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A complaint has facial plausibility when there is enough factual content 'that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When considering the sufficiency of a complaint on a 12(b)(6) motion, a court "must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Id*. (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).  "In addition to the complaint, courts may consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case in disposing of a motion to dismiss under Rule 12(b)(6)."  *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.2 (3d Cir. 1994); *see also See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

A complaint that merely alleges entitlement to relief, without alleging facts that show such an entitlement, must be dismissed.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id*. at 679.  A complaint must contain "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  This pleading standard, however, does not require a complaint to prove the plaintiff's claims or to disprove anticipated defenses.  "There are two sides to every story.  But a

6

complaint need not tell both." *Doe v. Princeton Univ.*, 30 F.4th 335, 339 (3d Cir. 2022).  Under the standard of *Twombly* and *Iqbal*, a district court must "accept[ ] as true" the factual assertions of a complaint," and remain mindful that "[t]he proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment."  *Id.* at 342 (citations omitted).

In determining whether dismissal of the complaint is appropriate, courts use a two-part analysis.  *Fowler*, 578 F.3d at 210.  First, courts separate the factual and legal elements of the claim and accept all of the complaint's well-pleaded facts as true.  *Id*. at 210-11.  Next, courts determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'"  *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).  The analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

## III.    DISCUSSION

### A.       FCRA Purpose and Relevant Provisions

In enacting the FCRA, "Congress found that '[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating . . . information on consumers.'  Therefore, '[t]here is a need to ensure that [they] exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.'"  *Long v. Se. Pennsylvania Transp. Auth*., 903 F.3d 312, 318 (3d Cir. 2018) (quoting 15 U.S.C. §§ 1681(a)(3), (a)(4).)  The provisions of the FCRA seek to ensure that "consumer credit, personnel, insurance, and other information" is assembled, evaluated, and investigated "in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b).  "'These consumer[-]oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect

7

those objectives." *Long*, 903 F.3d at 318-19 (quoting *Cortez v. Trans Union*, LLC, 617 F.3d

688, 706 (3d Cir. 2010).)

The following terms defined in the FCRA are relevant to resolution of BANA's Motion.

Under the FCRA, a "consumer" is an individual, 15 U.S.C. § 1681a(c), and a "person" is "any

individual, partnership, corporation, trust, estate, cooperative, association, government or

governmental subdivision or agency, or other entity," *id.* § 1681a(b).  A "consumer reporting

agency" is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis,

regularly engages in whole or in part in the practice of assembling or evaluating consumer credit

information or other information on consumers for the purpose of furnishing consumer reports to

third parties, and which uses any means or facility of interstate commerce for the purpose of

preparing or furnishing consumer reports." *Id.* § 1681a(f).

 "The term 'consumer report' means any written, oral, or other communication of any

information by a consumer reporting agency bearing on a consumer's credit worthiness, credit

standing, credit capacity, character, general reputation, personal characteristics, or mode of living

which is used or expected to be used or collected in whole or in part for the purpose of serving as

a factor in establishing the consumer's eligibility for . . . (B) employment purposes." *Id.*

§ 1681a(d)(1).  The FCRA contains certain exclusions from the definition of "consumer report,"

providing that this term does not include "any-- (i) report containing information solely as to

transactions or experiences between the consumer and the person making the report; [or] (ii)

communication of that information among persons related by common ownership or affiliated by

corporate control." *Id.* § 1681a(d)(2)(A)(i), (ii).  "Employment purposes," when used with

respect to a consumer report, "means a report used for the purpose of evaluating a consumer for

employment, promotion, reassignment or retention as an employee." *Id.* § 1681a(h).

In the context of employment, the FCRA defines "adverse action" as a "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee," *id.* § 1681a(k)(1)(B)(ii); or, under the "catch-all" provision, "an action taken or determination that is . . . made in connection with an application that was made by, or a transaction that was initiated by, any consumer" and "adverse to the interests of the consumer," *id.* § 1681a(k)(1)(B)(iv).

Within the framework of the preceding sections, the FCRA sets forth the permissible purposes, and conditions on certain uses, of consumer reports. *See* 15 U.S.C. § 1681b.  In this action, Plaintiff alleges that BANA violated § 1681b(b)(3), which provides as follows:

Conditions on use for adverse actions

(A) In general

Except as provided in subparagraph (B), in using a consumer report for employment purposes, before taking any adverse action ***based in whole or in part on the report***, the person intending to take such adverse action shall provide to the consumer to whom the report relates--

(i) a copy of the report; and

(ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Bureau under section 1681g(c)(3) of this title.

15 U.S.C. § 1681b(b)(3) (emphasis added).[5]  The purpose of this pre-adverse action notice is to provide applicants and employees with sufficient time to discuss the reports with prospective or current employers or to otherwise respond before the employer takes adverse action. *See Long*, 903 F.3d at 319 (3d Cir. 2018) ("The meaning of § 1681b(b)(3) is plain:  before an employer

---

[5] Additional sections of the FCRA impose further obligations relating to adverse employment action, including requiring post-adverse action notice, *see* 15 U.S.C. § 1681m(a); and imposing specified duties on a person taking certain actions based on information provided by an affiliate, *see id.* § 1681m(b)(2).

takes adverse action based in any part on a consumer report, the consumer has a right to receive a description of his rights under the FCRA, as well as a copy of his report, regardless of its accuracy."); *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 537 (E.D. Pa. 2012) (same).

###    B.    Plaintiff Alleges a Plausible Claim Under the FCRA

Before addressing BANA's arguments for dismissal, we note that BANA does not challenge Plaintiff's allegations that, for purposes of the FCRA, Cook is a "consumer," he and BANA are "persons," BANA obtained a "consumer report" (or reports) from a "consumer reporting agency" (or agencies) for "employment purposes,"[6] and BANA's revocation of Plaintiff's employment offer was an "adverse action."

Rather, BANA's Motion is premised on the contentions that Plaintiff has not and cannot allege that BANA based its rescission of his employment offer on information it received from a consumer reporting agency in a consumer report.  (BANA Mem. at 1.)  Specifically, BANA argues that Plaintiff's claim under FCRA § 1681b(b)(3) is foreclosed by the Complaint's allegations:  stating that "[t]o [Plaintiff's] knowledge, no information was supplied during the background investigation that could even remotely be construed as negative"; reciting BANA's counsel's assertions that the adverse decision was based on BANA's review of Cook's receipt and use of EIDL funds purportedly gleaned from BANA's review of its own records; and asserting that BANA relied on information from third parties, including the SBA, in deciding to revoke his offer.  (*Id.* at 3-4, 6-7.)  We disagree.

---

[6] Specifically, it appears undisputed that BIG and Equifax are "consumer reporting agencies" as defined by FCRA.  *Id.* § 1681a(f).

First, Plaintiff's allegation that, **to his knowledge**, no negative information was supplied during the background investigation does not preclude his claim for violation of the FCRA pre-adverse action notice requirement.[7]  By its terms, § 1681b(b)(3) does not limit the notice obligation to situations involving the use of negative (or inaccurate) information in a consumer report.  *See* 15 U.S.C. § 1681b(b)(3)(A); *see also Long*, 903 F.3d at 319 (3d Cir. 2018) (holding that the notice requirements of FCRA § 1681b are "not limited to situations where the report is inaccurate"); *Robertson v. Allied Solutions, LLC*, 902 F.3d 690, 696, (7th Cir. 2018) ("[A]n employer's disclosure obligations under [15 U.S.C. § 1681b(b)(3)(A) ] exist to serve interests beyond the problem of inaccurate reports.").

Second, the fact that Plaintiff was not made aware of negative information supplied during the background investigation does not render implausible inferences that the consumer report(s) obtained by BANA from consumer reporting agencies, did in fact contain negative information, or that BANA based its adverse action, **in whole or in part**, on negative consumer report information.  To the contrary, such inferences are plausible in view of Plaintiff's allegations that:  (1) BANA Talent Acquisition advised him on October 6, 2021, that he was no longer being considered for employment "based on his 'background check results'" (*see* Compl. ¶ 18); (2) it was not until weeks later that BANA contended first, that its adverse action was based on Plaintiff's PPP loan and, later, on his EIDL loans through the SBA (*Id.* ¶¶ 29-30); and (3) BANA was not a party to, and had no role in, Plaintiff's EIDL loans and, therefore, BANA learned of those loans from, and based its decision, at least in part, on information from a third

---

[7] We note that the sources of information considered and bases for BANA's revocation of Plaintiff's employment offer are uniquely within BANA's knowledge.  *See, e.g., Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) ("Several Courts of Appeals accept allegations "on information and belief" when the facts at issue are peculiarly within the defendant's possession.")

party consumer reporting agency, whether BIG, Equifax, or another agency not disclosed to Plaintiff by BANA.  (*Id.* ¶¶ 31, 35-36.)

Finally, the fact that Plaintiff's allegations recount BANA's "varying and inconsistent" – and allegedly *post hoc* – explanations, does not constitute an admission that the explanations are true, nor does it negate the reasonable contrary inferences that can be drawn when BANA's proffered explanations are considered in the context of Plaintiff's other allegations, which must be taken as true at the pleading stage.  *See, e.g.*, *Doe.*, 30 F.4th at 342 ("The proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment.") Although the Complaint does not explicitly plead which consumer reporting agency(ies) provided consumer report(s) containing information about the PPP and EIDL loans issued to Cook's business, it does plead that BANA requested authorization for and obtained consumer reports and that such reports were the source of the information upon which BANA based, in whole or in part, its adverse action.  BANA's self-serving assertion that it relied on its own account records is insufficient to negate the plausible inferences that arise from Plaintiff's allegations.  *See*, *e.g.*, *Reardon v. ClosetMaid Corp.*, No. 08-01730, 2013 WL 6231606, at *15 (W.D. Pa. Dec. 2, 2013); *Vellon v. Chefs' Warehouse, Inc.*, No. 22-04809, 2023 WL 6394228, at *4 (S.D.N.Y. Sept. 30, 2023).

## IV.   CONCLUSION

For the foregoing reasons, BANA's Motion to Dismiss is denied.  An appropriate order follows.

BY THE COURT:


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**